OFFIT KURMAN, P.A.
Ted G. Semaya, Esq.
Eric J. Lanter, Esq.
590 Madison Avenue, 6ᵗʰ Floor
New York, NY 10022
(212) 545-1900

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

Mary Heinrich, as Executor of the Estate of
Catherine Butler a/k/a Catherine Butler Muzio
a/k/a Catherine T. Butler Muzio; Mary
Heinrich, as Trustee for the Catherine Butler
Muzio Living Trust; Mary Heinrich, as Trustee
for the Leonard Muzio Living Trust; and Mary
Heinrich, in her individual capacity.

                              Plaintiffs,

                - against -

Malayene Dean, Charles Yassim a/k/a Charles
Yassin, Morgan Stanley Smith Barney, LLC,
Horace M. Barker, Citibank N.A. and JOHN
DOES 1-10.

                              Defendants.

---

Civil Action No. <u>21-10657</u>

**Jury Trial Demanded**

## COMPLAINT

Plaintiffs Mary Heinrich, as Trustee for the Catherine Butler Muzio Living Trust,

(the "Catherine Trust"); as Trustee for the Leonard Muzio Living Trust (the "Leonard

Trust") (said Trusts referred to hereinafter collectively as the "Trusts"); as Executor for the

Estate of Catherine Butler (a/k/a Catherine Butler Muzio a/k/a Catherine T. Butler Muzio)

(the "Estate" or the "Butler Estate"), and Mary Heinrich in her individual capacity, by their

attorneys, Offit Kurman, P.A., for their Complaint against Defendants Malayene Dean,

Charles Yassim a/k/a Charles Yassin (referred to hereinafter as "Charles Yassim," or

{00075591.DOCX;1}

"Yassim"), Morgan Stanley Smith Barney, LLC ("Morgan Stanley"), Horace M. Barker,

Citibank, N.A. ("Citibank") and John Does 1-10 allege, as follows:

## NATURE OF THE ACTION

1.      This action is against Defendants Malayene Dean and Charles Yassim based

on acts they committed separately and jointly as part of a scheme to induce their elderly

neighbor, Catherine Muzio ("Mrs. Muzio"), and her family to accept Dean as a trusted

caregiver of Mrs. Muzio, in order to be designated as Agent under a Power of Attorney

granted by Mrs. Muzio ("POA") and access to property owned by Mrs. Muzio and by the

Trusts, which POA and access they used to steal the property of Mrs. Muzio and the Trusts.

2.      This theft included, but was not limited to, converting property currently

determined to be almost $1,000,000 owned individually by Mrs. Muzio (now her Estate) of

which $590,000 held in the Trusts' accounts at Morgan Stanley, for which Trusts Ms.

Heinrich was and is a Trustee and of which she was and is a beneficiary.

3.      Investigation of Dean's and Yassim's misconduct is ongoing, but it is clear

that in the course of their conversion of Mrs. Muzio's individually owned property and Trust

property, they a) exploited Mrs. Muzio over a span of six years during which she was

elderly, eventually became incapacitated, and developed dementia, b) used Mrs. Muzio's

Citibank checking account as their personal piggy bank, closing out other accounts owned

by Mrs. Muzio and obtaining control over sources of her income in order to make transfers

into the Citibank checking account from which they converted property for their own use

and benefit; c) transferred property from the respective Trusts' Morgan Stanley accounts to

Mrs. Muzio's Citibank checking account from which they converted property for their own

use and benefit; d) used Mrs. Muzio's credit cards to make purchases for themselves,

including purchases made when Mrs. Muzio had dementia and was incapacitated; e)

arranged for themselves to have electronic access to Mrs. Muzio's bank accounts by establishing Yassim as the contact person for the Trusts' Morgan Stanley accounts and Mrs. Muzio's Discover and American Express credit card accounts; f) upon information and belief, surrendered and cashed in an SBLI life insurance policy for which Leonard Muzio was the beneficiary and had the policy proceeds transferred to Mrs. Muzio's Citibank checking account from which they converted property for their own use and benefit; g) terminated an annuity contract with Allstate in which Mrs. Muzio was the annuitant and owner and had the annuity proceeds transferred to her Citibank checking account from which they converted property for their own use and benefit; h) withdrew $50,000 from a Citibank savings account owned by Mrs. Muzio in trust for Ms. Heinrich, in February 2021, and deposited the proceeds into Mrs. Muzio's Citibank checking account from which they converted property for their own use and benefit; i) closed three Apple Bank accounts from 2014-2015 withdrawing in excess of $180,000, and deposited the funds into Mrs. Muzio's Citibank savings account from which they converted property for their own use and benefit. One Apple account containing more than $117,000 was closed only five days after Dean was appointed as Agent under the POA. On the same day that Apple account was closed, two checks were written from Ms. Muzio's Citibank checking account totaling approximately $118,000 payable to Dean and identified as gifts in the "memo" line of the check. The checks posted to Mrs. Muzio's account as follows: Check # 674: $58,000 cleared by the bank on 9/23/15, Check # 675: $60,000 cleared by the bank on 10/13/15; j) caused two checks totaling more than $45,000 to be written from Mrs. Muzio's Santander bank account and deposited into her Citibank checking account (Check #1396109 dated 11/15/16 for $26,145.54, which was posted into the Citibank checking account on 11/20/17 and Check #139578 dated 02/27/17 for $19,260.16, which was posted into the Citibank

checking account on 03/06/17); k) caused a $53,858.49 check dated January 24, 2018 from Mrs. Muzio's Capital One bank account, which posted on January 25, 2018, to be deposited into her Citibank checking account; l) caused the proceeds of a U.S. Treasury Bond in the amount of $10,000 to be deposited in Mrs. Muzio's Citibank checking account (the date the proceeds were deposited was November 27, 2019); m) upon information and belief, received Mrs. Muzio's postal mail before and after her death, and concealed and/or destroyed incriminating evidence therein; and n) interfered with the sale of Mrs. Muzio's house, owned by the Catherine Trust, after her death, scaring off buyers one of whose offer to purchase the house had been accepted by the Catherine Trust, through menacing behavior and false statements regarding the condition of the real property for sale.

4.      Defendant Morgan Stanley committed gross negligence and aided and abetted Dean's and Yassim's fraud by allowing the transfer of funds from the Trusts' accounts.

5.      Defendant Horace M. Barker is a First Vice President and Financial Advisor with Morgan Stanley who had primary responsibility for managing the Trusts' accounts with Morgan Stanley.

6.      Morgan Stanley and Barker took instructions from Yassim, who had no authority regarding the accounts, and they ignored other suspicious activity, which red flags, upon information and belief, caused Morgan Stanley eventually to place a hold on the accounts shortly before Mrs. Muzio's death. Morgan Stanley did not at any time inform Ms. Heinrich as Trustee of the Trusts of the suspicious activity or of the improper transfers of trust funds.

7.      Defendant Citibank received more than $940,000 transferred from the Trusts' accounts at Morgan Stanley into personal accounts of Mrs. Muzio at Citibank, then

allowed improper transfers purportedly made pursuant to the Power of Attorney where a reasonable inquiry clearly would have revealed the improper nature of these transactions.

8.    The criminal scheme in which Dean and Yassim engaged was perpetrated by using financial exploitation, elder abuse and related mechanisms to prey on a very ill, elderly and vulnerable woman, whose dementia worsened during the last year of her life, in the midst of the COVID-19 pandemic. Mrs. Muzio died on March 20, 2021, at the age of 94.

9.    Dean and Yassim have engaged and continue to engage in a pattern of criminal misconduct which has lasted longer than three years, which they perpetrated through mail fraud, wire fraud and bank fraud for the purpose of their own financial gain causing substantial financial harm to the Trusts, Mrs. Muzio and her Estate.

10.    The conduct, exploitation and crimes committed by Dean and Yassim constitute elder financial abuse, which is becoming more prevalent, and thus more dangerous, in our aging society. Such conduct is egregious, despicable and wanton, with extreme moral culpability, which has deep and lasting public policy effects as stated in further detail below.

**THE PARTIES**

11.    Ms. Heinrich is the niece of Mrs. Muzio. As set forth above, Ms. Heinrich has been appointed as the Preliminary Executor of Mrs. Muzio's Estate and is the Trustee of the Catherine Trust and of the Leonard Trust. Ms. Heinrich resides in Mohegan Lake, N.Y.

12.    Dean was the next-door neighbor of Mrs. Muzio and acted as the caregiver for Mrs. Muzio who resided at 130-04 Lefferts Blvd., S. Ozone Park, Queens, New York. Dean resides in Queens, N.Y.

13.     Yassim was and, upon information and belief, still is a co-conspirator who acted in concert with Dean. Upon information and belief, he resides at 66 Barbey Street, Brooklyn, N.Y. 11207.

14.     Defendant Morgan Stanley is a limited liability company organized under the laws of Delaware, which, among other things, provides financial services and advice to its customers regarding wealth management and financial goals with an office at 399 Park Avenue, New York, N.Y. 10043.

15.     Defendant Horace M. Barker is a First Vice President and Financial Advisor with Morgan Stanley who had primary responsibility for managing the Trusts' accounts with Morgan Stanley.

16.     Defendant Citibank is a National Association which operates as a bank. The Bank provides savings accounts, deposits, loans, mortgages, investment funds, credit and debit cards, insurance, capital markets and advisory, electronic, and private banking services. Citibank serves customers worldwide. Its corporate address is 388 Greenwich Street, New York, N.Y. 10013.

17.     Defendants JOHN DOES 1-10 consist of corporate and/or individual defendants who are yet to be identified as individuals or entities who either committed wrongful acts against Mrs. Muzio or the Trusts and/or abetted those who committed such acts.

## VENUE AND JURISDICTION

18.     This is a civil action for damages and other relief arising under the laws of the United States, including the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq*., mail fraud, 18 U.S.C. § 1341, wire fraud, 18 U.S.C. § 1343 and bank fraud 18 U.S.C. § 1344; and under New York law and the common law for breaches of

fiduciary duty, fraud, conversion, intentional interference with contractual relations, intentional interference with prospective business advantage, defamation (injurious falsehood) and for injunctive relief.

19.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (actions arising under the laws of the United States) and 18 U.S.C. § 1964 (jurisdiction under Civil RICO actions). The Court has subject matter jurisdiction over the related common law claims and state law claims pursuant to the Court's supplemental jurisdiction under 28 U.S.C. § 1367.

20.     This Court has personal jurisdiction over Defendants because, upon information and belief, all individual Defendants reside in New York and the institutional Defendants do business directly and/or indirectly within the State of New York and have their respective principal places of business in New York. Morgan Stanley publicizes its worldwide headquarters to be at 1585 Broadway, New York, New York 10036. It also is registered as a Foreign Limited Liability Company in New York State with a service of process name and address at 28 Liberty St., New York, New York 10005. Citibank is registered to do business in New York and publicizes the address of its global headquarters as 388 Greenwich Street, New York, New York 10013.The acts complained of herein have taken place within this judicial district. Further, upon information and belief, the effects of Defendants' actions have been felt in the State of New York and this District such that it would be reasonable for this Court to exercise personal jurisdiction over them.

21.     Venue is proper under 28 U.S.C. § 1391 as a substantial part of the events giving rise to the claim occurred within this District.

## GENERAL ALLEGATIONS

22.     Mrs. Muzio was married to Leonard Muzio until his death in 2004. Neither Mrs. Muzio nor Mr. Muzio had children. Mrs. Muzio's closest relative is Ms. Heinrich, who is her niece.

23.     Beginning in or about 2014, Mrs. Muzio received assistance in her home from her neighbor, Dean, who resided next door; Dean represented to Ms. Heinrich and, upon information and belief, Mrs. Muzio that she was available to assist with Mrs. Muzio's care and that she would act as Mrs. Muzio's friend, aide and assistant. In late 2016 and early 2017, Mrs. Muzio began to display signs of moderate dementia and her care needs increased. Shortly thereafter, Mrs. Muzio became homebound.

24.     On or about September 17, 2015, Dean and Yassim drove Mrs. Muzio to her lawyer's office and requested that a new Power of Attorney (POA) be drafted appointing Dean as her Agent, removing Ms. Heinrich as her primary Agent, and instead naming Ms. Heinrich as her successor Agent. The new POA appointing Dean did not contain a statutory gift rider. Dean did not inform Ms. Heinrich that she had transported Mrs. Muzio to the lawyer's office, nor that Mrs. Muzio had executed a new POA in which Dean was appointed to be the primary Agent. Ms. Heinrich is a nurse who works long hours and resides in upstate New York. At the time the new POA was executed, Ms. Heinrich had minor children, had her elderly mother living with her and her family and was furthering her education in the evenings. Therefore, she was unable to provide the assistance that Mrs. Muzio required on a daily basis.

25.     Ms. Heinrich and Mrs. Muzio's extended family initially were appreciative of Dean's assistance to Mrs. Muzio, especially as Mrs. Muzio's condition worsened. Ms.

Heinrich and Mrs. Muzio's extended family believed Mrs. Muzio was well-cared for and that her needs were being met.

26.     Dean ingratiated herself with Mrs. Muzio and continued to insert herself into Mrs. Muzio's daily life and, as a result, Ms. Heinrich and Mrs. Muzio's extended family trusted Dean and Yassim.

27.     As time went on, Dean began to isolate Mrs. Muzio from visitors and refused phone calls, making visits by the extended family with Mrs. Muzio difficult and, in some cases, impossible.

28.     The emergence of the COVID pandemic made replacing the increasingly controlling Dean with a new caregiver for Mrs. Muzio impractical. Dean lived right next door, Mrs. Muzio was familiar with her, and it would be unsafe to introduce a new caregiver into the home because that could expose Mrs. Muzio to COVID.

29.     The pandemic and related quarantine allowed for Dean, with the support and assistance of Yassim, to further isolate Mrs. Muzio from her extended family. Visits from family members became unsafe, particularly visits from Ms. Heinrich, who was a nurse and afraid to possibly increase Mrs. Muzio's exposure to infection by COVID due to her work in the hospital.

30.     It is important to note that Mrs. Muzio, upon her death, at 94 years of age, appeared to have dementia, and in the last year of her life, was largely non-verbal.

31.     On February 12, 2021, approximately one month prior to Mrs. Muzio's death, Dean contacted Ms. Heinrich and told her that she needed Ms. Heinrich to transfer funds from the Leonard Trust to Mrs. Muzio's Citibank checking account because the money was "running out." The request did not make sense to Ms. Heinrich because she knew that Mrs. Muzio's income was more than sufficient to cover all of the expenses

related to Mrs. Muzio's maintenance and support since Mrs. Muzio had virtually no expenses other than the costs of her care as she did not leave the house without Dean's assistance.

32.     Ms. Heinrich, who was the sole Trustee of the Catherine Trust and a Co-Trustee of the Leonard Trust, became suspicious of Dean's request and immediately contacted Horace M. Barker at Morgan Stanley, the brokerage firm where the Trusts' accounts were held.

33.     Barker told Ms. Heinrich that he was "unaware" of her being a Trustee and claimed not to have copies of the Trust on file that would indicate Ms. Heinrich was, in fact, the Trustee.

34.     Barker also told Ms. Heinrich that he took instructions regarding the Trust accounts from Yassim, with whom he was in regular telephone communication, and from Mrs. Muzio—even though by that point Mrs. Muzio did not have capacity and could not speak.

35.     Barker informed Ms. Heinrich that the Trust accounts had been put "on hold," but he did not explain why and was steadfast in his insistence that he took instructions on the Trust accounts from Yassim, not from Ms. Heinrich, despite the account being put on hold.

36.     When Ms. Heinrich asked Barker for the account statements, he refused to provide any to her.

37.     Ms. Heinrich then provided Morgan Stanley with copies of the Trusts and Leonard Muzio's death certificate and engaged legal counsel to assert her rights as Trustee. After her attorneys wrote to Mr. Barker, Ms. Heinrich finally received the Trusts' account statements.

38.     Ms. Heinrich reviewed the Morgan Stanley account statements for the Trusts and discovered that more than $590,000 had been withdrawn without her knowledge or consent. Between 2014-2020, a total of sixteen withdrawals were made from, and cash payments drawn on, the Catherine Trust account, totaling $457,400. Between 2017-2020, four withdrawals were made from and cash payments drawn on the Leonard Trust account totaling $135,600.

39.     Upon information and belief, Dean and Yassim electronically transferred from the Morgan Stanley Trust accounts to Mrs. Muzio's personal checking account held at Citibank in Mrs. Muzio's name individually. It should be noted that Mrs. Muzio was 94 years old, had dementia and did not have the capacity to effectuate an electronic transfer or the ability to use a computer for many years prior to her death.

40.     In addition to Barker treating Yassim as the primary contact person and taking instructions from Yassim with respect to the Trust Accounts, Barker allowed Yassim to establish himself as the online electronic contact person for the Trust accounts using his email address and telephone number.

41.     Ms. Heinrich has since determined that Yassim also established a governing relationship over Mrs. Muzio's Discover and American Express accounts, in addition to the Morgan Stanley Trust accounts, by insinuating himself as the online electronic contact for those accounts even though Yassim was not even an Agent under the POA, much less a Trustee of either of the Trusts.

42.     In addition to the theft of the funds from the Morgan Stanley Trust accounts, Dean and Yassim arranged for funds and property from other sources belonging to Mrs. Muzio to be transferred to her Citibank checking account. They wrote checks from the Citibank account to themselves or for their own purposes, through various means including

exertion of undue influence over Mrs. Muzio, obtaining her signature on blank checks, and, upon information and belief, forging her signature and improperly using the POA to pay gifts to themselves, despite the fact that the POA did not permit the Agent, Dean, to give gifts.

43.     On January 29, 2017, Dean and Yassim arranged for the surrender of an SBLI life insurance policy in the amount of $52,198.21 for which Leonard Muzio was the beneficiary. They redeemed the policy and had the policy proceeds transferred to Mrs. Muzio's Citibank checking account.

44.     In 2016, Dean and Yassim arranged for termination of an annuity contract with Allstate in which Mrs. Muzio was the annuitant and owner. The annuity contract was terminated on or about June 7, 2016. Yassim prepared the application for termination of the annuity contract. The application falsely listed Dean's address as Mrs. Muzio's address. Pursuant to the termination application prepared by Yassim, annuity proceeds in the sum of $42,816.69 were surrendered and deposited into Mrs. Muzio's Citibank checking account on June 9, 2016.

45.     Dean and Yassim closed three Apple Bank accounts from 2014 to 2015, withdrawing in excess of $180,000, and deposited the funds into Mrs. Muzio's Citibank savings account. One Apple account containing more than $117,000 was closed only four days after Dean was appointed Agent under the POA. On the same day that Apple account was closed, Dean wrote two checks, as Agent under the POA, from Mrs. Muzio's Citibank checking account totaling $118,000 payable to Dean and identified as gifts in the "memo" line of the check. Check # 674 for $58,000 was cleared by the bank on September 23, 2015. Check # 675 for $60,000 was cleared by the bank on October 13, 2015.

46.    In February 2021, shortly before Mrs. Muzio's death, and at a time when she was incapacitated, at home, in hospice (palliative) care and unable to speak or consume food, Dean and Yassim arranged for the withdrawal of $50,000 from a Citibank savings account owned by Mrs. Muzio in trust for Ms. Heinrich. The $50,000 was deposited into Mrs. Muzio's Citibank checking account. On June 23, 2014, a CD in Mrs. Muzio's Citibank savings account was sold and the proceeds in the amount of $25,901.35 were deposited in Mrs. Muzio's Citibank checking account.

47.    After arranging for the transfer of hundreds of thousands of dollars into Mrs. Muzio's Citibank checking account, Dean and Yassim used those funds for their own benefit.

48.    Ms. Heinrich discovered in Mrs. Muzio's home multiple discarded pre-signed checks printed to be drawn on Mrs. Muzio's Citibank checking account which displayed nearly illegible signatures.

49.    Ms. Heinrich also discovered several record-keeping check stubs in Mrs. Muzio's home with each bearing one of the following descriptions: "Cash for Catherine," "Bonus," "Vacation," "Birthday," and "Gift." There were 27 check stubs with these descriptions totaling $50,800. Ms. Heinrich also uncovered another 13 actual cashed checks with "Gift" written in the memo field totaling $187,350 (including the two checks totaling $118,000, previously detailed in paragraph 45).

50.    Checks written from Mrs. Muzio's Citibank checking account confirm that Dean was normally paid approximately $20 an hour for providing caregiver services to Mrs. Muzio.

51.    Records from Mrs. Muzio's Citibank checking account reflect 20 checks for a total of $65,100, reflecting a grossly inflated rate for Dean's caregiver services, well

above the normal $20 an hour rate, payable to and endorsed by Dean between February 15,

2020 to January 23, 2021. Each of these checks was for $3,000 or more. These checks were

issued toward the end of Mrs. Muzio's life, when her capacity had become greatly

diminished.

52.     Records from Mrs. Muzio's Citibank checking account reflect at least 68

checks for a total of $82,400 payable to and endorsed by Yassim between January 4, 2020

to March 20, 2021. Each of these checks was for $1,000 or more. These checks were issued

toward the end of Mrs. Muzio's life, when her capacity had become greatly diminished.

53.     Upon initial inspection of Mrs. Muzio's home, Ms. Heinrich discovered

both an American Express and a Discover credit card statement. The statements showed

activity during the last month of Mrs. Muzio's life when she was in hospice care at home,

unable to speak or consume food. The statements showed, collectively, more than $1,000 in

charges for restaurants, purchases of liquor, a seafood company, a cell phone bill, and

clothing.

54.     Ms. Heinrich also discovered that both the American Express and Discover

credit card accounts were also electronically set up identical to the Morgan Stanley Trust

accounts: with the contact information and authentication of Yassim's email address and

cellphone number.

55.     Subsequent review of the Discover credit card statements shows that

charges from 2015-2021 totaled $58,821.54. These charges included liquor charges of

$21,772.66, food-restaurant charges of $15,060.60, Walgreen's charges of $13,376.87,

Home Depot charges of $5,530.36 and combined Wayfair and Walmart charges of

$3,081.45. Clearly these charges were not initiated by Mrs. Muzio who was elderly and

unable to leave her house without Dean's assistance during this time frame and who was a

light drinker who was not supposed to have alcohol during this time period as it interfered with her medication, Coumadin. Upon information and belief, these Discover charges were made by Dean and Yassim for liquor, food and goods that they consumed.

56.     Subsequent review of the American Express credit card statements shows that charges from 2013-2021 totaled $86,157.90. These charges included food-restaurant charges of $42,772.66, liquor charges of $8,039.32, Walgreen's charges of $5,207.41, food charges of $4,629.44, clothing charges of $3,180.57, Home Depot charges of $2,476.01, online food charges of $2,158.53, online Amazon charges of $1,486.76 and P.C. Richards charges of $1,112.14. Clearly, most, and possibly all, of these charges were not initiated by Mrs. Muzio who was elderly and unable to leave her house without Dean's assistance during this time frame and who was a light drinker who was not supposed to have alcohol during this time period as it interfered with her medication, Coumadin. Upon information and belief, these American Express charges were made by Defendants Dean and Yassim for liquor, food and goods that they consumed.

**PUBLIC POLICY IMPACT AND MORAL AND ETHICAL CONSIDERATIONS ARISING FROM THE CONDUCT SET FORTH ABOVE**

57.     The exploitation and abuse of Mrs. Muzio as a pathway to line Dean's and Yassim's pockets is insidious, malicious, despicable and contrary to all social, moral and ethical norms and provides a more than adequate basis for the imposition here of punitive damages.

58.     The New York City, New York State and federal governments have for some time recognized the horrors of the kind of conduct alleged in this complaint, have conducted several elder exploitation abuse studies, and have created mechanisms to detect, prevent, report and punish elder financial exploitation and abuse, recognizing, however that

it is, as one major report pointed out, "under the radar," meaning insidious and woefully under-reported and under-punished.

59.    The 2015 White House Conference on Aging described elder exploitation and abuse as a serious national public health problem affecting millions of older Americans each year which includes issues facing every American. The same study suggested that as few as one in 23 cases actually are reported to authorities. That statistic was based in part on a 2011 New York State report entitled: Under the Radar, New York State Elder Abuse Prevalence Study, ("Under the Radar" study) prepared jointly by Weill Cornell Medical Center, the New York City Department for the Aging and Lifespan of Greater Rochester, Inc.

60.    The 2015 White House study also reported that about two-thirds of elder abuse victims are women.

61.    The financial exploitation of the elderly, as occurred here, often causes substantial economic losses for families and society.

62.    The federal government dealt with this problem as a priority and the 2015 White House Conference said it remained an important focus for a number of federal agencies, led by the Department of Health and Human Services which funds the National Center on Elder Abuse and the National Indigenous Elder Justice Initiative.

63.    In June 2015, U.S. Senators Blumenthal and Ayotte introduced the Robert Matava Elder Abuse Victims Act of 2015, described as a bill to better protect, serve, and advance the rights of victims of elder abuse and financial exploitation by encouraging states and other qualified entities to hold offenders accountable, enhance the capacity of the justice system to investigate, pursue, and prosecute elder abuse cases, identify existing

resources to leverage to the extent possible, and assure data collection, research and evaluation to promote the efficacy and efficiency of the activities described in that Act.

64.     The Federal Elder Justice Act enacted in 2010, as part of the Patient Protection and Affordable Care Act, establishes the Elder Justice Coordinating Counsel, chaired by the HHS Department Secretary, with the U.S. Attorney General and a number of other federal agency representatives, and is designed to strengthen federal and state efforts to prevent and deal with exploitation and abuse.

65.     The Elder Justice Coordinating Counsel recommends, among other things, that investigation and prosecution of exploitation and abuse cases be supported by combating elder financial exploitation, including abuse by fiduciaries, through various federal enforcement activities, policy initiatives, oversight education and more.

66.     New York's Under the Radar study said it was one of the most ambitious and comprehensive studies to seek to quantify the extent of elder abuse in a discrete jurisdiction in any single American state: New York. The report's major findings described a dramatic gap between the rate of elder exploitation and abuse reported by older New Yorkers and the number of cases referred to and served in formal systems.

67.     That study also found that the elder exploitation and abuse rate in New York State was nearly 24 times greater than the number of cases actually referred to various agencies, and then applied the incidence rate estimated by the study to the general population of older New Yorkers, concluding an estimated 260,000 older adults in New York had been victims of at least one form of elder exploitation and abuse in the then-preceding year (between 2008 and 2009). Financial exploitation (as took place here) in a self-reported study, was one of the most prevalent forms of mistreatment.

68.     That report also described elder abuse and exploitation "as an insidious and tragic social problem that affects a significant number of older adults." The report called such abuse often the hidden and unreported phenomenon which has been increasingly recognized nationally and internationally as a serious social problem.

69.     The Under the Radar report defined financial exploitation, as that which took place here, as a major element of elder abuse, including the improper use of an older adult's funds, property or resources by another individual or individuals, including but not limited to, by fraud, false pretense, embezzlement, conspiracy, coerced property transfers and denial of access to assets. These are exactly the types of acts perpetrated by the Enterprise Defendants and enabled through the gross negligence of the corporate defendants.

70.     New York City's Department for the Aging also describes elder abuse as increasing as our population ages, stressing the importance of reporting abuse to law enforcement. That Department again describes financial abuse, as occurred here, as one of the more serious ways older persons can be abused.

71.     New York State's Office of Children and Family and Office for the Aging Services also cautions about financial exploitation, a common mechanism, as here, to abuse the elderly and, as here, damage such person's family—like coerced payment transfers, fraud, falsifying records and denial of access to records.

72.     These studies are only a part of the important work being done to prevent, then punish, the kind of hideous and unlawful conduct which was perpetrated here, conduct which represents a high degree of immorality and was wanton, reckless and malicious and bordered on, if not actually, criminal indifference to norms of behavior. This material also

provides an adequate and independent basis for the imposition, jointly and severally, of punitive damages, as also set out in the following claims for relief.

73.      Defendants' conduct gives rise to several claims for relief as set forth below.

## COUNT I

### Racketeering
### (On Behalf of All Plaintiffs against Dean and Yassim)

74.      All allegations contained in the foregoing paragraphs are incorporated in this one as though fully set forth herein.

75.      Section 1964(c) of Title 18, United States Code, or the Racketeer Influenced and Corrupt Organizations Act states that "[a]ny person injured in his business or property by reason of a violation of section 1962 . . . may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee."

#### The Enterprise

76.      All allegations contained in the foregoing paragraphs are incorporated in this one as though fully set forth herein.

77.      From 2014 through to Mrs. Muzio's death in March 2021, and, upon information and belief, continuing to the present with threat of future repetition, the Enterprise Defendants, Malayene Dean and Charles Yassim, acted as an association in fact to commit criminal acts, in an effort to deprive Plaintiffs of valuable property and to transfer that property to the Enterprise Defendants. The criminal acts committed by the Enterprise Defendants include but are not limited to mail fraud, wire fraud and bank fraud.

78.      The association of the Enterprise Defendants constitutes an "Enterprise" as defined by Title 18, United States Code, 1961(4). The Enterprise constitutes an ongoing organization whose members functioned as a continued unit for a common purpose of

achieving the objectives of the enterprise. The Enterprise and the Enterprise Defendants were engaged in, and their activities affected, interstate commerce, including but not limited to: conversion of property from the respective Trusts' Morgan Stanley accounts to Mrs. Muzio's Citibank checking account from which the Enterprise Defendants further converted property for their own use and benefit; using Mrs. Muzio's Discover and American Express credit cards to make purchases for themselves at a time when Mrs. Muzio had dementia and was incapacitated; arranging for electronic access to Mrs. Muzio's accounts, with Yassim established as the online contact person for the Trusts' Morgan Stanley account and Mrs. Muzio's Discover and American Express credit cards; arranging for the surrender of an SBLI life insurance policy for which Leonard Muzio was the beneficiary and having the policy proceeds transferred to Mrs. Muzio's Citibank checking account from which the Enterprise Defendants further converted property for their own use and benefit; termination of an annuity contract with Allstate in which Mrs. Muzio was the annuitant and owner and arranging for the annuity proceeds to be transferred to her Citibank checking account from which the Enterprise Defendants further converted property for their own use and benefit; withdrawal of $50,000 from a Citibank savings account owned by Mrs. Muzio in trust for Ms. Heinrich, in February 2021, and deposit of those funds into Mrs. Muzio's Citibank checking account from which the Enterprise Defendants converted property for their own use and benefit; the closing out of three Apple Bank accounts owned by Mrs. Muzio and the withdrawal of more than $180,000, and depositing of those funds into Mrs. Muzio's Citibank savings account from which the Enterprise Defendants converted property for their own use and benefit; and interference with the sale of Mrs. Muzio's house, owned by the Catherine Trust, after her death, scaring off buyers one of whose offer to purchase the house had been accepted by the Catherine

Trust, through menacing behavior and false statements regarding the condition of the real property for sale.

79.     The purpose of the Enterprise included the following: for the Enterprise Defendants to induce Mrs. Muzio, Ms. Heinrich and other relatives of Mrs. Muzio to believe that Dean could be relied upon as a trusted caregiver to her elderly neighbor, Mrs. Muzio, in order to exploit Mrs. Muzio for their own financial gain by obtaining a Power of Attorney for Dean, to be used fraudulently and in breach of her fiduciary duties, and to convert Plaintiffs' property from a variety of sources for the benefit of Dean and Yassim.

80.     The Enterprise Defendants participated in the operation and management of the Enterprise by formulating the scheme utilized to accomplish their goals listed above and by executing the scheme by commission of racketeering acts in order to accomplish their goals.

<u>The Pattern of Racketeering Activity</u>

81.     All allegations contained in the foregoing paragraphs are incorporated in this one as though fully set forth herein.

82.     From 2014 through to Mrs. Muzio's death in March 2021, and possibly continuing into the present and the future, the Enterprise Defendants, being associated with the Enterprise referenced herein, an enterprise engaged in, and the activities of which affected interstate commerce, unlawfully conducted the affairs of the Enterprise through a pattern of racketeering activity, that is, through the commission of the Racketeering Acts set forth in further detail below. The Racketeering Acts were continuous from 2014 to 2021 and may be ongoing. They are all connected, related, and committed by the same members of the racketeering enterprise, using the same methods of illegal activity, and dedicated to the common goals set forth above herein.

<u>The Racketeering Acts</u>

83.    All allegations contained in the foregoing paragraphs are incorporated in this one as though fully set forth herein.

84.    To execute the scheme to exploit and defraud set forth above, the Enterprise Defendants caused the use of the U.S. mail and wires, and committed bank fraud related to the following Racketeering Acts:

**<u>Obtaining Power of Attorney and Assuming Role as Caretaker with Intent to Exploit:</u>**

Beginning no later than 2014, Dean, who had moved next door to Mrs. Muzio in 2007, began to assist Mrs. Muzio in her home with activities of daily living including, but not limited to, dressing, bathing, wound care, ambulating, cooking, cleaning, running errands, and transporting Mrs. Muzio for medical appointments, with the intent to foster the trust of Mrs. Muzio and her family in order to exploit Mrs. Muzio financially. Yassim assisted in and participated in the scheme initiated by Dean. On September 15, 2015, Dean and Yassim drove Mrs. Muzio to Mrs. Muzio's attorney's office in order to obtain a Power of Attorney ("POA") for Dean to act for Mrs. Muzio as her Agent, with the intent to use the POA to exploit Mrs. Muzio financially. Prior to the September 15, 2015 meeting, Dean had telephoned Mrs. Muzio's attorney and instructed him to draft a new POA. The attorney asked Dean to come to his office with Mrs. Muzio. After meeting with Mrs. Muzio's attorney on September 15, 2015, they returned to the attorney's office on September 17, 2015, at which time the POA was executed. The POA removed Plaintiff as Mrs. Muzio's primary Agent and instead named Dean. Dean did not advise Ms. Heinrich that she had transported Mrs. Muzio to the lawyer's office, nor that she had executed a new POA in which she was now the primary Agent,

despite the fact that they were in communication. A true and correct copy of the POA is annexed hereto as **Exhibit 1**.

**Unauthorized transfers from Morgan Stanley Trust Accounts:**

Fraudulent and unauthorized transfers from Morgan Stanley Trust accounts for the Catherine Trust and the Leonard Trust were made by Dean and Yassim to Mrs. Muzio's personal Citibank account improperly using Dean's POA for the purpose of writing checks and making payments from the Citibank account for the benefit of the Enterprise Defendants. These withdrawals and payments were effectuated by the Enterprise Defendants, who had no legal right to do so. Yassim communicated with the Morgan Stanley broker on the Trust accounts, Horace M. Barker, who implemented instructions from Yassim regarding the accounts. Yassim either implied that he was acting with authority on behalf of Mrs. Muzio or, upon information and belief, enlisted Barker to intentionally act in concert with the Enterprise Defendants in converting the Trusts' property. Yassim also arranged to have electronic access to the Trust accounts by establishing online account access using his email address and telephone number. These transfers took place between 2014-2020.

**Unauthorized transfers from Mrs. Muzio's Citibank checking account:**

The Enterprise Defendants transferred funds from the Citibank account to themselves or for their own purposes, through various means including exertion of undue influence over Mrs. Muzio, obtaining her signature on blank checks, forging her signature and improperly using the POA to pay gifts to themselves, despite the fact that the POA did not permit the Agent, Dean, to give gifts. A number of recordkeeping check stubs found in Mrs. Muzio's home each contained one of the

following descriptions: "Cash for Catherine," "Bonus," "Vacation," "Birthday,"

and "Gift." There were 27 check stubs with these descriptions totaling $50,800.

Another 13 actual cashed checks with "Gift" written in the memo field totaling

$187,350 have been uncovered. Records from Mrs. Muzio's Citibank checking

account also reflect 20 checks for a total of $65,100, not related to payment for

Dean's caregiver services, payable to and endorsed by Dean between February 15,

2020 to January 23, 2021. Each of these checks was for $3,000 or more. These

checks were issued toward the end of Mrs. Muzio's life, when her capacity had

become greatly diminished. Records from Mrs. Muzio's Citibank checking

account also reflect at least 68 checks for a total of $82,400 payable to and

endorsed by Yassim between January 4, 2020 to March 20, 2021. Each of these

checks was for $1,000 or more. Again, these checks were issued toward the end of

Mrs. Muzio's life, when her capacity had become greatly diminished.

**Unauthorized transfers from Mrs. Muzio's Citibank savings account:**

In February 2021, the Enterprise Defendants caused the withdrawal of $50,000

from a Citibank savings account owned by Mrs. Muzio, for which Ms. Heinrich

was a beneficiary, and they deposited the proceeds into Mrs. Muzio's Citibank

checking account from which they converted property for their own use and benefit.

On June 23, 2014, a CD in Mrs. Muzio's Citibank savings account was sold and the

proceeds in the amount of $25,901.35 were deposited in Mrs. Muzio's Citibank

checking account.

**Unauthorized charges to Mrs. Muzio's Amex and Discover credit cards:**

The Enterprise Defendants made unauthorized charges to Mrs. Muzio's Discover

and American Express credit cards to purchase, for themselves, food, liquor, and

other valuable goods. Mrs. Muzio's Discover credit card statements reflect charges from 2015-2021 totaling $58,821.54. These charges included liquor charges of $21,772.66, food-restaurant charges of $15,060.60, Walgreen's charges of $13,376.87, Home Depot charges of $5,530.36 and combined Wayfair and Walmart charges of $3,081.45. Mrs. Muzio's American Express credit card statements reflect charges from 2013-2021 totaling $86,157.90. These charges included food-restaurant charges of $42,772.66, liquor charges of $8,039.32, Walgreen's charges of $5,207.41, food charges of $4,629.44, clothing charges of $3,180.57, Home Depot charges of $2,476.01, online food charges of $2,158.53, online Amazon charges of $1,486.76 and P.C. Richards charges of $1,112.14. Clearly the bulk of these charges were not initiated by Mrs. Muzio who was elderly and unable to leave her house without Dean's assistance during this time frame and who was a light drinker who was not supposed to have alcohol during this time period as it interfered with her medication, Coumadin.

**Cashing in Life Insurance Policy:**

Upon information and belief, the Enterprise Defendants cashed in a life insurance policy belonging to Mrs. Muzio and diverted the funds derived from cashing in this policy to themselves. The policy was from SBLI USA Life Insurance Company, Inc. and bearing Policy No. 900109328 0090. The Enterprise Defendants arranged for the surrender and cashing in of the SBLI life insurance policy for which Leonard Muzio was the beneficiary and had the policy proceeds in the amount of $52,198.21 transferred to Mrs. Muzio's Citibank checking account from which they converted property for their own use and benefit.

**Conversion of Annuity Contract with Allstate:**

In 2016, Dean and Yassim arranged for termination of an annuity contract with Allstate in which Mrs. Muzio was the annuitant and owner. The annuity contract was terminated on or about June 7, 2016. Yassim prepared the application for termination of the annuity contract. The application falsely listed Dean's address as Mrs. Muzio's address. Pursuant to the termination application prepared by Yassim, annuity proceeds in the sum of $42,816.69 were surrendered and transferred to Mrs. Muzio's Citibank checking account from which they converted property for their own use and benefit.

**Conversion of Apple Bank Accounts:**

The Enterprise Defendants closed out three Apple Bank accounts from 2014-2015 withdrawing in excess of $180,000 and deposited the funds into Mrs. Muzio's Citibank savings account from which they converted property for their own use and benefit. One Apple account containing more than $117,000 was closed only five days after Defendant Dean was appointed as Agent under the POA. On the same day that Apple account was closed, Dean cashed two checks written from Ms. Muzio's Citibank checking account totaling approximately $118,000 payable to Dean and identified as gifts in the "memo" line of the check.

**Conversion of Property from Santander Bank:**

The Enterprise Defendants caused two checks totaling more than $45,000 to be written from Mrs. Muzio's Santander bank account and deposited into her Citibank checking account (Check #1396109 dated 11/15/16 for $26,145.54, which posted into the Citibank checking account on 11/20/17 and Check #139578 dated 02/27/17

for $19,260.16, which posted into the Citibank checking account on 03/06/17) from which they converted property for their own use and benefit.

**Conversion of Property from Capital One Bank Account:**

The Enterprise Defendants caused a $53,869.49 check dated January 24, 2018 from Mrs. Muzio's Capital One bank account, which posted on January 25, 2018, to be deposited into her Citibank checking account from which they converted property for their own use and benefit.

**Conversion of U.S. Treasury Bond:**

The Enterprise Defendants caused a U.S. Treasury Bond in the amount of $10,000 to be deposited in Mrs. Muzio's Citibank checking account from which they converted property for their own use and benefit.  The post date for the Bond was November 27, 2019.

### RICO DAMAGES

85.    The acts of the Enterprise Defendants described above have caused injury to the Trusts and the Estate's business and property by reason of violations of 18 U.S.C. § 1962, in amounts to be determined at trial which is cumulatively not less than $1,000,000, plus interest, and Plaintiffs herein sue for threefold the damages sustained, and the costs of this suit, including reasonable attorneys' fees in an amount to be determined at trial.

86.    The Leonard Trust has incurred damages in an amount to be determined at trial which is not less than $135,600, plus interest and threefold the damages sustained, and the costs of this suit, including reasonable attorneys' fees in an amount to be determined at trial.

87.    The Catherine Trust has incurred damages in an amount to be determined at trial which is not less than $457,400, plus interest and threefold the damages sustained, and

the costs of this suit, including reasonable attorneys' fees in an amount to be determined at trial.

88.     The Estate has incurred damages in an amount to be determined at trial which is not less than $940,000, plus interest and threefold the damages sustained, and the costs of this suit, including reasonable attorneys' fees in an amount to be determined at trial.

89.     Ms. Heinrich has incurred damages in an amount to be determined at trial which is not less than $75,876, plus interest and threefold the damages sustained, and the costs of this suit, including reasonable attorneys' fees in an amount to be determined at trial.

## <u>COUNT II</u>

**Breach of Fiduciary Duty Under New York Common Law
(On Behalf of the Estate against Dean)**

90.     All allegations contained in the foregoing paragraphs are incorporated in this one as though fully set forth herein.

91.     Dean and Mrs. Muzio had a fiduciary relationship by virtue of Dean obtaining appointment as Agent under the POA to act on behalf of Mrs. Muzio. The POA did not contain a statutory gifts rider.

92.     Dean breached her fiduciary duties under the POA by using the POA to engage in self-dealing and conversion, including but not limited to using the POA to transfer property and funds belonging to Mrs. Muzio to herself and to Yassim.

93.     The subject acts committed by Dean as fiduciary were contrary to the interests of Mrs. Muzio to whom Dean owed a duty of loyalty.

94.     Dean's actions were conducted in bad faith, violated her legal obligations and were inconsistent with her status as an Agent with a fiduciary duty to Mrs. Muzio.

95.     Dean's breaches of her fiduciary duties were intentional, wanton, reckless and malicious.

96.     Dean's actions as described above were the direct and foreseeable cause of damage to the Estate, in an amount to be determined at trial, but not less than $940,000 plus interest.

97.     Plaintiff is entitled to punitive damages in an amount to be determined at trial, but not less than $1,000,000.

## COUNT III

### Aiding and Abetting Breach of Fiduciary Duty
### Under New York Common Law
### (On Behalf of the Estate against Yassim)

98.     All allegations contained in the foregoing paragraphs are incorporated in this one as though fully set forth herein.

99.     As set forth above, Dean breached her fiduciary duties to Mrs. Muzio.

100.     Yassim knowingly participated in the breach of fiduciary duty by providing substantial assistance to Dean including acts which affirmatively assisted Dean, helped to conceal the breach of fiduciary duty and enabled the breach of fiduciary duty to occur.

101.     These acts include, but are not limited to, communicating with Morgan Stanley to arrange for electronic transfers from the subject Trust accounts to Mrs. Muzio's private accounts in order to enable Dean to use the POA to write checks on and transfer funds from Mrs. Muzio's Citibank checking account and to fraudulently establish electronic online accounts for certain of Mrs. Muzio's accounts to allow Dean to have control over and access to those accounts.

102.     Yassim's aiding and abetting of fiduciary duties was intentional, wanton, reckless and malicious.

103.    These actions as described above were the direct and foreseeable cause of damage to Mrs. Muzio, and the Estate, in an amount to be determined at trial, but not less than $940,000, plus interest.

104.    Plaintiff is entitled to punitive damages in an amount to be determined at trial, but not less than $1,000,000.

## COUNT IV

**Fraud and Deceit Under New York Common Law**
**(On Behalf of All Plaintiffs against Dean and Yassim)**

105.    All allegations contained in the foregoing paragraphs are incorporated in this one as though fully set forth herein.

106.    Based on the facts as set forth above, and specifically the Enterprise Defendants' conduct as set forth above, the Enterprise Defendants, made false representations of fact to Mrs. Muzio and to her family members designed to induce Mrs. Muzio and her family into believing that the Enterprise Defendants were acting in the interests of Mrs. Muzio and that Dean was acting in good faith as a caregiver for Mrs. Muzio.

107.    The Enterprise Defendants made further false representations to bankers, banks and financial institutions, and other entities including but not limited to Morgan Stanley and Citibank, designed to induce those entities (except for any acting in concert with the Enterprise Defendants) into believing that they were authorized to make transactions that were in fact illegal and beyond the scope of their authority and were taken to effectuate the conversion of property from Mrs. Muzio and the Trusts.

108.    In the alternative, the Enterprise Defendants enlisted employees and agents of bankers, banks and financial institutions, and other entities including but not limited to

Morgan Stanley and Citibank to intentionally act in concert with the Enterprise Defendants in converting the Trusts' property.

109.    The above representations were intended: a) to falsely suggest that Dean was a trusted caregiver to Mrs. Muzio in order to place Dean and Yassim in a position to exploit her and her family financially by converting Mrs. Muzio's property for their own benefit and b) to deceive the bankers, banks and financial institutions, and other entities, to effectuate the transfers which resulted in the conversion of property from Mrs. Muzio and the subject Trusts.

110.    The above representations were known by the Enterprise Defendants to be false and were intended to induce Plaintiffs', and Mrs. Muzio's, reliance on them.

111.    Plaintiffs, and Mrs. Muzio, justifiably relied on the above representations which were intentional, wanton, reckless and malicious.

112.    The Leonard Trust has incurred damages in an amount to be determined at trial which is not less than $135,600, plus interest.

113.    The Catherine Trust has incurred damages in an amount to be determined at trial which is not less than $457,400, plus interest.

114.    The Estate has incurred damages in an amount to be determined at trial which is not less than $940,000, plus interest.

115.    Plaintiff Heinrich has incurred damages in an amount to be determined at trial which is not less than $75,876, plus interest

116.    The Plaintiffs are each entitled to punitive damages in an amount to be determined at trial, but not less than $1,000,000.

## COUNT V

**Conversion**
**(On Behalf of All Plaintiffs against Dean and Yassim)**

117.   All allegations contained in the foregoing paragraphs are incorporated in this one as though fully set forth herein.

118.   At all relevant times, Plaintiffs had respective possessory interests in the various forms of property which are the subject of this Complaint, including but not limited to the property in the Trust accounts, the property in Mrs. Muzio's Citibank checking account, the property in Mrs. Muzio's Citibank savings account and other property from an insurance policy, an annuity and Mrs. Muzio's Apple Bank account, which was liquidated and transferred to Mrs. Muzio's Citibank checking account from which the Enterprise Defendants converted property for their own use and benefit.

119.   The Enterprise Defendants, at several times, and in several ways, as detailed above, intentionally and without proper authority, exercised and sought to exercise dominion and control over Mrs. Muzio's and the respective Plaintiffs' property and property interests, interfering with their property interests, property, and rights to property, in derogation and exclusion of their rights, through efforts which deprived and denied Mrs. Muzio and the respective Plaintiffs access, control and possession of their property.

120.   The Enterprise Defendants knew that Plaintiffs had a possessory interest in the various forms of property which are the subject of this Complaint, including but not limited to the property in the Trust accounts, the property in Mrs. Muzio's Citibank checking account, the property in Mrs. Muzio's Citibank savings account and other property from insurance policies, annuities and Mrs. Muzio's Apple Bank account, which was liquidated and transferred to Mrs. Muzio's Citibank checking account from which they converted property for their own use and benefit.

121.    Nevertheless, the Enterprise Defendants interfered with and exercised rights and control over the property, preventing Plaintiffs from accessing, owning and controlling their property.

122.    The Leonard Trust has incurred damages in an amount to be determined at trial which is not less than $135,600, plus interest.

123.    The Catherine Trust has incurred damages in an amount to be determined at trial which is not less than $457,400, plus interest.

124.    The Estate has incurred damages in an amount to be determined at trial which is not less than $940,000, plus interest.

125.    Plaintiff Heinrich has incurred damages in an amount to be determined at trial which is not less than $75,876, plus interest.

126.    The Plaintiffs are each entitled to punitive damages in an amount to be determined at trial, but not less than $1,000,000.

## <u>COUNT VI</u>

### Intentional Interference with Prospective Economic Advantage
### (On Behalf of the Catherine Trust against Dean and Yassim)

127.    All allegations contained in the foregoing paragraphs are incorporated in this one as though fully set forth herein.

128.    In the aftermath of Mrs. Muzio's death, Dean interfered with the sale of Mrs. Muzio's house (the "Muzio House"), which was owned by the Catherine Trust. Dean and Yassim accomplished this interference by scaring off buyers, whose offer to purchase the house had been accepted, through menacing behavior and false statements regarding the condition of the real property for sale.

129.    Specifically, on May 20, 2021, at approximately 3:50pm, Dean, who occupies 130-06 Lefferts Blvd., S. Ozone Park in Queens, New York, which is

immediately adjacent to the Muzio house at 130-04 Lefferts Blvd, S. Ozone Park, Queens, New York initiated an unsolicited conversation with the prospective buyers of the Muzio House and their agent. The Muzio House is owned by the Catherine Trust. The buyers were there to conduct an inspection because their offer had been accepted by Ms. Heinrich as the Trustee of the Catherine Trust. Subject to satisfaction with their inspection of the house, the buyers intended to proceed with the purchase of the house at the agreed upon price of $615,000.

130.    The Catherine Trust's acceptance of the buyer's offer constitutes a contractual agreement which would have been concluded but for Dean's interference.

131.    After initiating the unsolicited conversation, Dean was very rude, used foul language to refer to Ms. Heinrich and falsely said that the Muzio House was in very poor condition and needed a lot of work. Dean and Yassim obviously intended to interfere with the sale of the Muzio House. Dean and Yassim were successful in doing so. The buyers backed out, costing the Catherine Trust the sale and the higher price the buyers had agreed to pay.

132.    On Saturday, June 12, 2021, Ms. Heinrich and her husband found in the mailbox of the Muzio House a fine for $100 against the house. The stated reason for the fine was failure to keep the area 18 inches from the curb clean. At that time, Ms. Heinrich and her husband observed garbage in the area of the house within 18 inches from the curb. The garbage consisted of a matted cup and food wrapper. The Muzio House was unoccupied at that time. Upon information and belief, Dean, the next-door neighbor, and Yassim were leaving garbage in front of the house in order to further interfere with and prevent its sale.

133.    On June 17, 2021, the realtor who was selling the house on behalf of the Catherine Trust informed Ms. Heinrich that someone stole the "For Sale" sign that the realtor had placed in front of the house. Upon information and belief, Dean and Yassim removed the "For Sale" sign in order to interfere with and prevent the sale of the house.

134.    The Catherine Trust had a business relationship with the buyers of the Muzio house.

135.    Dean and Yassim had knowledge of that business relationship and, without reasonable justification or excuse, intentionally and maliciously interfered with the business relationship.

136.    Dean and Yassim acted with the sole purpose of harming the Catherine Trust and used dishonest, unfair or improper means to interfere with the business relationship.

137.    Dean and Yassim's intentional and malicious actions caused injury to the relationship between the Catherine Trust and the buyers and induced the buyers to change their plans to buy the Muzio house.

138.    The Muzio house has since been sold on or about July 22, 2021, for $605,000, $10,000 less than the $615,000 the initial buyers had agreed to pay.

139.    The Catherine Trust sustained damages by reason of Dean and Yassim's intentional and malicious interference in an amount to be determined at trial but not less than the sum of $10,000.

140.    The Catherine Trust incurred further losses as a result of the interference with the first sale. In addition to the price differential, the interference resulted in costs for further listing of the house and further carrying costs for the house caused by the delay in an amount to be determined at trial.

141.     The Catherine Trust sustained damages by reason of Dean and Yassim's intentional and malicious interference in an amount to be determined at trial but not less than the sum of $10,000, plus additional costs incurred for further listing of the house and further carrying costs for the house.

142.     The Catherine Trust is entitled to punitive damages for the intentional and malicious interference in an amount to be determined at trial.

**COUNT VII**

**Defamation (Injurious Falsehood)**
**(On Behalf of the Catherine Trust and Plaintiff Heinrich Individually against Dean and Yassim)**

143.     All allegations contained in the foregoing paragraphs are incorporated in this one as though fully set forth herein.

144.     Dean's foul and vulgar statements to the buyers about Ms. Heinrich were disparaging and false. They were intended to impugn her honesty and credibility in her capacity as a Trustee of the Trust which was selling the Muzio house. They were also intended to dissuade the buyers from proceeding with their purchase of the Muzio House. These statements constitute defamation *per se* as to Ms. Heinrich.

145.     Dean's statements to the buyers that the Muzio House was in very poor condition and needed a lot of work were disparaging and false and constitute injurious falsehood about the Muzio House.

146.     The statements about Ms. Heinrich's administration of the Catherine Trust and of the competence and diligence of the Trustee of the Catherine Trust were made with malice comprising ill will, scienter and intent to dissuade the buyers from purchasing the Muzio House.

147.    The statements about the Muzio House were made with malice comprising ill will, scienter and intent to dissuade the buyers from purchasing the Muzio house.

148.    They were made to induce the buyers from dealing with the Catherine Trust and to otherwise deprive the Catherine Trust from a prospective economic advantage.

149.    The Catherine Trust sustained damages by reason of Dean's injurious falsehood and defamation in an amount to be determined at trial but not less than the sum of $10,000, plus additional costs incurred for further listing of the house and further carrying costs for the house.

150.    Ms. Heinrich is entitled to recover damages by reason of Dean's defamation *per se* in an amount to be determined at trial based on: 1) harm to her reputation and standing in the community; 2) mental distress; 3) humiliation; and 4) embarrassment.

151.    Plaintiffs Heinrich and the Catherine Trust are entitled to punitive damages for Dean and Yassim's intentional and malicious injurious falsehood and defamation in an amount to be determined at trial.

## COUNT VIII

### Gross Negligence
### (On Behalf of the Catherine Trust and the Leonard Trust against Morgan Stanley and Horace M. Barker)

152.    All allegations contained in the foregoing paragraphs are incorporated in this one as though fully set forth herein.

153.    Morgan Stanley is registered with the SEC as both a broker dealer and as an investment adviser. Morgan Stanley is a member of FINRA. Morgan Stanley is also subject to regulations issued by the U.S. Treasury, including the requirement to keep records on financial transactions and file reports with the Financial Crimes Enforcement Network (FinCEN) when suspicious activity that might indicate money laundering is detected.

Morgan Stanley is subject to, among other things, the provisions of the Bank Secrecy Act (the BSA), as well as amendments to the BSA enacted in Title III of the USA PATRIOT Act of 2001.

154.    Horace M. Barker is a First Vice President and Financial Advisor with Morgan Stanley who had primary responsibility for managing the Trusts' accounts with Morgan Stanley.

155.    On February 12, 2021, approximately one month prior to Mrs. Muzio's death, Dean contacted Ms. Heinrich and told her that she needed Ms. Heinrich to transfer funds from the Leonard Trust to Mrs. Muzio's Citibank checking account because the money was "running out." The request did not make sense to Ms. Heinrich because she knew that Mrs. Muzio's income was more than sufficient to cover all of the expenses related to Mrs. Muzio's maintenance and support since Mrs. Muzio had virtually no expenses other than the costs of her care as she did not leave the house without Dean's assistance.

156.    Ms. Heinrich, who was the sole Trustee of the Catherine Trust and a Co-Trustee of the Leonard Trust, became suspicious of Dean's request and immediately contacted Horace M. Barker at Morgan Stanley, the brokerage firm where the Trusts' accounts were held.

157.    Barker told Ms. Heinrich that he was "unaware" of her being a Trustee and claimed not to have copies of the Trust on file that would indicate Ms. Heinrich was, in fact, the Trustee.

158.    Barker also told Ms. Heinrich that he took instructions regarding the Trust accounts from Yassim, with whom he was in regular telephone communication and from

Mrs. Muzio—even though by that point Mrs. Muzio did not have capacity and could not speak.

159.    Barker informed Ms. Heinrich that the Trust accounts had been put "on hold," but he did not explain why and was steadfast in his insistence that he took instructions on the Trust accounts from Yassim, not from Ms. Heinrich, despite the account being put on hold.

160.    When Ms. Heinrich asked Barker for the account statements, he refused to provide any to her.

161.    Ms. Heinrich then provided Morgan Stanley with copies of the Trusts instruments and Leonard Muzio's death certificate and engaged legal counsel to assert her rights as Trustee. After her attorneys wrote to Mr. Barker, Ms. Heinrich finally received the Trusts' account statements.

162.    Ms. Heinrich reviewed the Morgan Stanley account statements for the Trusts and discovered that more than $940,000 was removed without her knowledge or consent. Sixteen withdrawals or cash payments totaling $457,400 were removed from the Catherine Trust between 2014-2020. Four withdrawals or cash payments totaling $135,600 were removed from the Leonard Trust between 2017-2020.

163.    Upon information and belief, Dean and Yassim electronically transferred from the Morgan Stanley Trust accounts to Mrs. Muzio's personal checking account held at Citibank in Mrs. Muzio's name individually. It should be noted that Mrs. Muzio was 94 years old, had dementia and did not have the capacity to effectuate an electronic transfer or the ability to use a computer for many years prior to her death.

164.    In addition to Barker treating Yassim as the primary contact person and taking instructions from Yassim with respect to the Trust Accounts, Barker allowed Yassim

to establish himself as the online electronic contact person for the Trust accounts using his email address and telephone number.

165.   Upon information and belief, the respective Trust instruments and any amendments were provided to Morgan Stanley at the time of the opening of the Trusts' Morgan Stanley accounts.

166.   Morgan Stanley either failed to maintain the Trust instruments or concealed its possession of the Trust instruments.

167.   The accounts were in the respective names of the Catherine Trust and the Leonard Trust. Nevertheless, Barker refused to recognize Ms. Heinrich as a trustee, even though the Trust instruments provided that she was a trustee.

168.   Morgan Stanley is a member of FINRA and subject to its rules. FINRA Rule 2090, FINRA's Know Your Customer Rule requires that: "Every member shall use reasonable diligence, in regard to the opening and maintenance of every account to know (and retain) the essential facts concerning every customer and concerning the authority of each person acting on behalf of such customer." Moreover, "For purposes of the Rule, facts 'essential' to 'knowing the customer' are those required to (a) effectively service the customer's account, (b) act in accordance with any special handling instructions for the account, (c) understanding the authority of each person acting on behalf of the customer, and (d) comply with applicable laws, regulations and rules." https://www.finra.org/rules-guidance/rulebooks/finra-rules/2090#the-rule.

169.   Barkers' treatment of Yassim, a non-Trustee, as the controlling person on the Trust accounts, and his acceptance of instructions from Yassim, both oral and written, was intentional, wrongful and without justification.

170.    Morgan Stanley also allowed Yassim, who was not authorized to make account transactions, to establish an electronic profile for the account through which fraudulent transfers were made.

171.    Multiple transfers exceeding $10,000 were made from the Trust accounts to Mrs. Muzio's Citibank checking account.

172.    These transfers triggered reporting requirements under the Bank Secrecy Act and the United States Patriot Act. Upon information and belief, Morgan Stanley did not report these transfers as it was required to do.

173.    The Trust accounts were placed on hold at some point.

174.    Barker and Morgan Stanley have refused to provide information regarding the reasons that the Trust accounts were placed on hold.

175.    Upon information and belief, the Trust accounts were place on hold due to "red flags" indicating unauthorized, improper or suspicious account activities and/or violations of Morgan Stanley's policies, procedures and systems designed to detect or prevent fraud and to detect or prevent fraudulent activities by Morgan Stanley's financial advisors.

176.    Ms. Heinrich, sole Trustee of the Catherine Trust and Co-Trustee of the Leonard Trust, was not provided with account statements for the Trust accounts prior to her legal counsel interceding on her behalf in or around March 2021.

177.    Ms. Heinrich was not informed of Yassim's involvement in managing the Trust accounts prior to her phone conversation with Barker in February 2021.

178.    Upon information and belief, Barker knew that the transfers directed by Yassim were unauthorized and that Yassim was not a Trustee of either of the Trust accounts.

179.     Upon information and belief Barker had actual knowledge of the scheme or wrongdoing being perpetrated by Yassim and Dean and acted in confederation with Yassim and Dean.

180.     The lack of disclosure and transparency from Barker and Morgan Stanley when questioned about the fraudulent transactions and Yassim's control of the accounts, along with the large and frequent transfers of funds out of the Trust accounts, provides a further basis to conclude that Barker acted intentionally and knowingly and that he willingly participated in Dean's and Yassim's scheme or wrongdoing.

181.     The Trusts are entitled to, and need, full disclosure of the actions and knowledge of Barker, Morgan Stanley, and Dean and Yassim, to discover the full scope of the fraud and wrongdoing.

182.     Barker and Morgan Stanley had a duty not to take instructions from Yassim, who was not a Trustee for either of the Trust accounts.

183.     Barker and Morgan Stanley had a duty not to allow unauthorized transfers of funds from the Trust accounts to non-Trust accounts.

184.     Barker and Morgan Stanley breached their duties to the Trusts.

185.     The Trusts each suffered injuries and damage as a result of Barker's and Morgan Stanley's breaches of duty.

186.     Barker's and Morgan Stanley's conduct, as described above, evinces a reckless disregard for the rights of others and smacks of intentional wrongdoing. As such, this conduct constitutes gross negligence.

187.     Morgan Stanley's gross negligence resulted in damages to the Catherine Trust in an amount to be determined at trial, but not less than $457,400, plus interest.

188.    Morgan Stanley's gross negligence resulted in damages to the Leonard Trust in an amount to be determined at trial, but not less than $135,600, plus interest.

189.    The Trusts are entitled to punitive damages in an amount to be determined at trial which is not less than $1,000,000 each.

## COUNT IX

### Aiding and Abetting Fraud
### (On Behalf of the Catherine Trust and the Leonard Trust against Morgan Stanley and Horace M. Barker)

190.    All allegations contained in the foregoing paragraphs are incorporated in this one as though fully set forth herein.

191.    Dean and Yassim committed an underlying fraud resulting in the conversion of property from the Trusts to Mrs. Muzio's Citibank checking account and the subsequent conversion of property from Mrs. Muzio's Citibank checking account to Dean and Yassim.

192.    Upon information and belief, Barker and Morgan Stanley had knowledge of the wrongful conduct of Dean and Yassim and acted in confederation with Dean and Yassim.

193.    Upon information and belief, Barker and Morgan Stanley provided substantial assistance to Dean and Yassim's commission of the underlying fraud by intentionally, knowingly and willingly participating in the underlying fraud.

194.    But for Barker and Morgan Stanley implementing the unauthorized transfers requested by the Dean and Yassim, the fraud and conversion of the Trusts' property could not have occurred.

195.    Morgan Stanley's aiding and abetting of the fraud resulted in damages to the Catherine Trust in an amount to be determined at trial, but not less than $457,400, plus interest.

196.    Morgan Stanley's aiding and abetting of the fraud resulted in damages to the Leonard Trust in an amount to be determined at trial, but not less than $135,600, plus interest.

197.    The Trusts are entitled to punitive damages in an amount to be determined at trial, but not less than $1,000,000 each.

## COUNT X

### Gross Negligence
### (On Behalf of All Plaintiffs against Citibank)

198.    All allegations contained in the foregoing paragraphs are incorporated in this one as though fully set forth herein.

199.    Citibank is a National Association which operates as a bank. The Bank provides savings accounts, deposits, loans, mortgages, investment fund, credit and debit cards, insurance, capital markets and advisory, electronic, and private banking services. Citibank serves customers worldwide. Its corporate address is 388 Greenwich Street, New York, N.Y. 10013.

200.    Citibank is a member of the Federal Reserve System, supervised by the Office of the Comptroller of the Currency (the "OCC") and is subject to federal law and regulations.

201.    Federal law and regulations long have required banks to have an Anti-Money Laundering program ("AML"). One element of these programs is monitoring customer account activity in order to detect possible fraud and money laundering. These requirements were first imposed by the Bank Secrecy Act of 1970 ("BSA") and federal banking regulations. 31 U.S.C. § 5311; 12 C.F.R. § 208.63. The Patriot Act, enacted into law in 2001, reinforced these obligations.

202.     One of the most basic of the anti-fraud requirements are Know Your Customer rules as set forth in Title III, Subtitle B of the Patriot Act, which, among other things, includes identifying the customer and account holder, verifying their identity, maintaining current and accurate customer information and continuously monitoring accounts for suspicious activity.

203.     Between 2014-2020, Defendant Citibank received more than $940,000 transferred from the Trusts' accounts at Morgan Stanley into Mrs. Muzio's Citibank checking account.

204.     Most, if not all, of these transfers exceeded $10,000 were made from the Trust accounts to Mrs. Muzio's Citibank checking account and triggered reporting requirements under the Bank Secrecy Act and the United States Patriot Act. Upon information and belief, Citibank did not report these transfers as they were required to do.

205.     As alleged above, on September 17, 2015, Dean obtained a POA to act as Agent on behalf of Mrs. Muzio. The POA did not contain a statutory gifts rider.

206.     Upon information and belief, the POA was provided to Citibank.

207.     As alleged above, from on or about 2014-2021 several unauthorized checks were written from Mrs. Muzio's Citibank checking account to the Enterprise Defendants and for their benefit.

208.     Dean and Yassim transferred funds from the Citibank account to themselves or for their own purposes, including multiple checks on which, upon information and belief, Mrs. Muzio's signature was forged and multiple checks for which Dean improperly used the POA to pay gifts to herself and to Yassim, despite the fact that the POA which did not permit the Agent, Dean, to give gifts.

209.    A number of record-keeping check stubs found in Mrs. Muzio's home after her death each contained one of the following descriptions: "Cash for Catherine," "Bonus," "Vacation," "Birthday," or "Gift." There were 27 check stubs with these descriptions totaling $50,800. Another 13 actually cashed checks with "Gift" written in the memo field totaling $187,350 have been uncovered. Records from Mrs. Muzio's Citibank checking account also reflect 19 checks for a total of $62,100, not related to payment for Dean's caregiver services, payable to and endorsed by Dean between February 15, 2020 to January 23, 2021. Each of these checks was for $3,000 or more. These checks were issued toward the end of Mrs. Muzio's life, when her capacity had become greatly diminished. Records from Mrs. Muzio's Citibank checking account also reflect at least 68 checks for a total of $82,400 payable to and endorsed by Yassim between January 4, 2020 and March 20, 2021. Each of these checks was for $1,000 or more. These checks were issued toward the end of Mrs. Muzio's life, when her capacity had become greatly diminished.

210.    Upon information and belief, additional checks were written from Mrs. Muzio's Citibank checking account to pay for unauthorized credit card charges that the Enterprise Defendants caused to be charged to Mrs. Muzio's American Express and Discover credit cards amounting to more than $100,000.

211.    Other large deposits were made into Mrs. Muzio's Citibank checking account from various sources including $50,000 from Mrs. Muzio's Citibank savings account f/t/b Ms. Heinrich; more than $180,000 from three Apple Bank accounts held by Mrs. Muzio; approximately $52,000 from a New York Life Insurance policy that was cashed in; and approximately $43,000 from an Allstate annuity contract.

212.     A forensic accounting will be required to determine the full extent of the unauthorized and improper checks written from Mrs. Muzio's Citibank checking account, which is at least $940,000, or an amount shown at trial to have been converted.

213.     The checks written from the Citibank checking account included many checks which were clearly outside the scope of the POA. For example, multiple checks were written to Dean, and Yassim, for vacations, salary, expenses, catered lunches and other purposes which were outside the scope of the POA.

214.     Upon information and belief, many of the checks written from the Citibank checking account were forged and were signed by either Dean or Yassim based upon the fact, upon information and belief, the signatures on these checks do not match the signature cards on file for the account.

215.     Many of the transfers into the Citibank checking account exceeded $10,000. Many of the improper checks written out of the Citibank account exceeded $10,000. These transactions should have triggered reporting requirements under the Bank Secrecy Act and the United States Patriot Act. Upon information and belief, Citibank did not report these transfers as it was required to do.

216.     The activities in Mrs. Muzio's Citibank checking account from approximately 2014 to her death in 2021 is replete with inherently suspicious activity. This suspicious activity includes but is not limited to the improper and fraudulent use of the POA; the checks which, upon information and belief, were forged; the large amount of deposits from multiple sources; the corresponding checks and withdrawals made payable to Yassim and Dean, the Agent appointed by the POA; the advanced age of Mrs. Muzio, and the fact that these large and frequent transactions mainly took place in the time frame in which the POA was issued.

217.   By way of further example, one of Mrs. Muzio's Apple bank accounts was closed five days after Dean was appointed as agent under the POA. That Apple account contained approximately $117,000 which, upon information and belief, was deposited into Mrs. Muzio's Citibank checking account. On that same day, Dean cashed two checks from the Citibank checking account totaling $118,000 payable to Dean and identified as "gifts" in the memo line of the check.

218.   Upon information and belief, further relevant information will become available upon a forensic accounting as well as discovery of documents, information and records from Citibank.

219.   The above stated facts were sufficient to cause a reasonably prudent person to suspect that account funds were being misappropriated and triggered a duty of inquiry on the part of Citibank.

220.   Citibank failed to conduct a reasonable inquiry when the obligation arose and as a result is charged with such knowledge as would have been apparent had the reasonable inquiry been conducted.

221.   Upon information and belief, Citibank had actual knowledge of the scheme or wrongdoing being perpetrated by Yassim and Dean and acted in confederation with Yassim and Dean.

222.   The above facts would cause a reasonably prudent person to suspect that funds were being misappropriated. These facts and circumstances provide a basis to conclude that Citibank acted intentionally and knowingly and willingly participated in Dean and Yassim's scheme or wrongdoing.

223.     The Plaintiffs are entitled to, and need, full disclosure of the actions and knowledge of Citibank, and Dean and Yassim, to discover the full scope of the fraud and wrongdoing.

224.     Citibank had a duty not to accept suspicious and unauthorized transfers from the Trusts, not to allow improper checks which were forged and/or did not comply with the POA to be written from the Citibank checking account to Dean and Yassim, and not to ignore the suspicious account activity, including frequent and large deposits, followed by corresponding withdrawals, many payable to the newly appointed Agent under the POA as "gifts" despite there being no gifts rider in the POA.

225.     Citibank breached its duties.

226.     Plaintiffs suffered damages as a result of Citibank's breach of its duties.

227.     Citibank's conduct, as described above, evinces a reckless disregard for the rights of others and smacks of intentional wrongdoing. As such, this conduct constitutes gross negligence.

228.     Each of the Plaintiffs suffered injuries and damage as a result of Citibank's gross negligence.

229.     The Leonard Trust has incurred damages in an amount to be determined at trial which is not less than $135,600, plus interest.

230.     The Catherine Trust has incurred damages in an amount to be determined at trial which is not less than $457,400, plus interest.

231.     The Estate has incurred damages in an amount to be determined at trial which is not less than $940,000, plus interest.

232.     Ms. Heinrich has incurred damages in an amount to be determined at trial which is not less than $75,876, plus interest.

233.    The Plaintiffs are each entitled to punitive damages in an amount to be determined at trial, but not less than $1,000,000.

## COUNT XI

### Aiding and Abetting Fraud
### (On Behalf of All Plaintiffs against Citibank)

234.    All allegations contained in the foregoing paragraphs are incorporated in this one as though fully set forth herein.

235.    Dean and Yassim committed an underlying fraud resulting in the conversion of property from the Trusts to Mrs. Muzio's Citibank checking account and the subsequent conversion of property from Mrs. Muzio's Citibank checking account to Dean and Yassim.

236.    Upon information and belief, Citibank had knowledge of the wrongful conduct of Dean and Yassim and acted in confederation with Dean and Yassim.

237.    Upon information and belief, Citibank provided substantial assistance to Dean and Yassim's commission of the underlying fraud by intentionally, knowingly and willingly participated in the underlying fraud.

238.    But for Citibank's actions and inactions in accepting Trust funds from Morgan Stanley and property from various other sources and permitting forged and unauthorized checks, which were issued outside the scope of the POA, to be paid to Dean and Yassim, the fraud and conversion of Plaintiffs' property could not have occurred.

239.    Citibank's aiding and abetting of the fraud resulted in damages to Plaintiffs.

240.    The Leonard Trust has incurred damages in an amount to be determined at trial which is not less than $135,600, plus interest.

241.    The Catherine Trust has incurred damages in an amount to be determined at trial which is not less than $457,400, plus interest.

242.    The Estate has incurred damages in an amount to be determined at trial which is not less than $940,000, plus interest.

243.    Ms. Heinrich has incurred damages in an amount to be determined at trial which is not less than $75,876, plus interest.

244.    The Plaintiffs are each entitled to punitive damages in an amount to be determined at trial, but not less than $1,000,000.

## COUNT XII

### Aiding and Abetting Breach of Fiduciary Duty
### (On Behalf of the Estate against Citibank)

245.    All allegations contained in the foregoing paragraphs are incorporated in this one as though fully set forth herein.

246.    As set forth above, Dean breached her fiduciary duties to Mrs. Muzio.

247.    Citibank knowingly participated in the breach of fiduciary duty by providing substantial assistance to Defendant Dean including acts which affirmatively assisted Dean, helped to conceal the breach of fiduciary duty and enabled the breach of fiduciary duty to occur.

248.    These acts include, but are not limited to, permitting electronic transfers from the subject Trust accounts to Mrs. Muzio's Citibank checking accounts in order to enable Defendant Dean to use her POA to write checks and transfer funds from Mrs. Muzio's Citibank checking account to herself and to Yassim.

249.    Citibank's aiding and abetting of fiduciary duties was intentional, wanton, reckless and malicious.

250.    These actions as described above were a direct and foreseeable cause of damage to Mrs. Muzio, and the Estate, in an amount to be determined at trial, but not less than $940,000, plus interest.

251.    The Estate is entitled to punitive damages in an amount to be determined at trial, but not less than $1,000,000.

## COUNT XIII

**Unjust Enrichment**
**(On Behalf of All Plaintiffs against Dean and Yassim)**

252.    All allegations contained in the foregoing paragraphs are incorporated in this one as though fully set forth herein.

253.    Defendants Dean and Yassim were enriched at Plaintiffs' expense.

254.    It is against equity and good conscience to permit Defendants Dean and Yassim to retain what Plaintiffs seek to recover.

255.    There is a connection or relationship between Plaintiffs and Defendants Dean and Yassim that caused reliance or inducement on the Plaintiffs' part.

256.    The Leonard Trust has incurred damages in an amount to be determined at trial which is not less than $135,600, plus interest.

257.    The Catherine Trust has incurred damages in an amount to be determined at trial which is not less than $457,400, plus interest.

258.    The Estate has incurred damages in an amount to be determined at trial which is not less than $940,000, plus interest.

259.    Plaintiff Heinrich has incurred damages in an amount to be determined at trial which is not less than $75,876, plus interest.

260.    The Plaintiffs are each entitled to punitive damages in an amount to be determined at trial, but not less than $1,000,000.

## COUNT XIV

**Constructive Trust**
**(On Behalf of All Plaintiffs against Dean and Yassim)**

261.    All allegations contained in the foregoing paragraphs are incorporated in this one as though fully set forth herein.

262.    There was a confidential or fiduciary relationship between Plaintiffs and Defendants Dean and Yassim.

263.    Defendants Dean and Yassim expressly or impliedly promised that they were caring for Mrs. Muzio's financial and physical health.

264.    Plaintiffs relied on Defendants Dean and Yassmin's promises, and Defendants Dean and Yassim secured transfers of funds which unjustly enriched them.

265.    It is necessary to establish a constructive trust given these circumstances as a constructive trust satisfies the demands of justice.

266.    The Leonard Trust has incurred damages in an amount to be determined at trial which is not less than $135,600, plus interest.

267.    The Catherine Trust has incurred damages in an amount to be determined at trial which is not less than $457,400, plus interest.

268.    The Estate has incurred damages in an amount to be determined at trial which is not less than $940,000, plus interest.

269.    Plaintiff Heinrich has incurred damages in an amount to be determined at trial which is not less than $75,876, plus interest.

270.    The Plaintiffs are each entitled to punitive damages in an amount to be determined at trial, but not less than $1,000,000.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment in their favor and against Defendants, as follows:

A.      On the First Count of Racketeering on behalf of all Plaintiffs against Defendants Malayene Dean and Charles Yassim, jointly and severally: i. an award of compensatory damages in favor of the Leonard Trust in an amount to be determined at trial which is not less than $135,600, plus interest, and treble damages and the costs of suit including reasonable attorneys' fees in an amount to be determined at trial; ii. an award of compensatory damages in favor of the Catherine Trust in an amount to be determined at trial which is not less than $457,400, plus interest, and treble damages and the costs of suit including reasonable attorneys' fees in an amount to be determined at trial; iii. an award of compensatory damages in favor of the Estate of Catherine Butler in an amount to be determined at trial which is not less than $940,000, plus interest, and treble damages and the costs of suit including reasonable attorneys' fees in an amount to be determined at trial; and iv. an award of compensatory damages in favor of Mary Heinrich in an amount to be determined at trial which is not less than $75,876, plus interest, and treble damages and the costs of suit including reasonable attorneys' fees in an amount to be determined at trial;

B.      On the Second Count of Breach of Fiduciary Duty Under New York Common Law on behalf of the Estate against Defendant Malayene Dean: an award of compensatory damages in favor of the Estate of Catherine Butler in an amount to be determined at trial which is not less than $940,000, plus interest, and punitive damages in an amount to be determined at trial which is not less than $1,000,000;

C.      On the Third Count of Aiding and Abetting Breach of Fiduciary Duty Under New York Common Law on behalf of the Estate against Defendant Charles Yassim: an

award of compensatory damages in favor of the Estate of Catherine Butler in an amount to be determined at trial which is not less than $940,000, plus interest, and punitive damages in an amount to be determined at trial which is not less than $1,000,000;

      D.     On the Fourth Count of Fraud and Deceit Under New York Common Law on behalf of all Plaintiffs against Defendants Malayene Dean and Charles Yassim, jointly and severally: i. an award of compensatory damages in favor of the Leonard Trust in an amount to be determined at trial which is not less than $135,600, plus interest, and punitive damages in an amount to be determined at trial which is not less than $1,000,000; ii. an award of compensatory damages in favor of the Catherine Trust in an amount to be determined at trial which is not less than $457,400, plus interest, and punitive damages in an amount to be determined at trial which is not less than $1,000,000; iii. an award of compensatory damages in favor of the Estate of Catherine Butler in an amount to be determined at trial which is not less than $940,000, plus interest, and punitive damages in an amount to be determined at trial which is not less than $1,000,000; and iv. an award of compensatory damages in favor of Mary Heinrich in an amount to be determined at trial which is not less than $75,876, plus interest, and punitive damages in an amount to be determined at trial which is not less than $1,000,000;

      E.     On the Fifth Count of Conversion on behalf of all Plaintiffs against Defendants Malayene Dean and Charles Yassim, jointly and severally: i. an award of compensatory damages in favor of the Leonard Trust in an amount to be determined at trial which is not less than $135,600, plus interest, and punitive damages in an amount to be determined at trial which is not less than $1,000,000; ii. an award of compensatory damages in favor of the Catherine Trust in an amount to be determined at trial which is not less than $457,400, plus interest, and punitive damages in an amount to be determined at

trial which is not less than $1,000,000; iii. an award of compensatory damages in favor of the Estate of Catherine Butler in an amount to be determined at trial which is not less than $940,000, plus interest, and punitive damages in an amount to be determined at trial which is not less than $1,000,000; and iv. an award of compensatory damages in favor of Mary Heinrich in an amount to be determined at trial which is not less than $75,876, plus interest, and punitive damages in an amount to be determined at trial which is not less than $1,000,000;

F.      On the Sixth Count of Intentional Interference with Prospective Economic Advantage on behalf of the Catherine Trust against Defendants Malayene Dean and Charles Yassim, jointly and severally: an award of compensatory damages in favor of the Catherine Trust in an amount to be determined at trial which is not less than $10,000, plus interest, and punitive damages in an amount to be determined at trial;

G.      On the Seventh Count of Defamation (Injurious Falsehood) on behalf of the Catherine Trust and Plaintiff Heinrich Individually against Defendants Malayene Dean and Charles Yassim, jointly and severally: an award of compensatory damages in favor of the Catherine Trust in an amount to be determined at trial, plus interest, and punitive damages in an amount to be determined at trial;

H.      On the Eighth Count of Gross Negligence on behalf of the Catherine Trust and the Leonard Trust against Defendants Morgan Stanley Smith Barney, LLC and Horace M. Barker, jointly and severally: i. an award of compensatory damages in favor of the Catherine Trust in an amount to be determined at trial which is not less than $457,400, plus interest, and punitive damages in an amount to be determined at trial; and ii. an award of compensatory damages in favor of the Leonard Trust in an amount to be determined at trial

which is not less than $135,600, plus interest, and punitive damages in an amount to be determined at trial;

I.      On the Ninth Count of Aiding and Abetting Fraud on behalf of the Catherine Trust and the Leonard Trust against Defendants Morgan Stanley Smith Barney, LLC and Horace M. Barker, jointly and severally: i. an award of compensatory damages in favor of the Catherine Trust in an amount to be determined at trial which is not less than $457,400, plus interest, and punitive damages in an amount to be determined at trial which is not less than $1,000,000; and ii. an award of compensatory damages in favor of the Leonard Trust in an amount to be determined at trial which is not less than $135,600, plus interest, and punitive damages in an amount to be determined at trial which is not less than $1,000,000;

J.      On the Tenth Count of Gross Negligence on behalf of all Plaintiffs against Defendant Citibank, N.A.: i. an award of compensatory damages in favor of the Leonard Trust in an amount to be determined at trial which is not less than $135,600, plus interest, and punitive damages in an amount to be determined at trial which is not less than $1,000,000; ii. an award of compensatory damages in favor of the Catherine Trust in an amount to be determined at trial which is not less than $457,400, plus interest, and punitive damages in an amount to be determined at trial which is not less than $1,000,000; iii. an award of compensatory damages in favor of the Estate of Catherine Butler in an amount to be determined at trial which is not less than $940,000, plus interest, and punitive damages in an amount to be determined at trial which is not less than $1,000,000; and iv. an award of compensatory damages in favor of Mary Heinrich in an amount to be determined at trial which is not less than $75,876, plus interest, and punitive damages in an amount to be determined at trial which is not less than $1,000,000;

K.      On the Eleventh Count of Aiding and Abetting Fraud on behalf of all

Plaintiffs against Defendant Citibank, N.A.: i. an award of compensatory damages in favor

of the Leonard Trust in an amount to be determined at trial which is not less than $135,600,

plus interest, and punitive damages in an amount to be determined at trial which is not less

than $1,000,000; ii. an award of compensatory damages in favor of the Catherine Trust in

an amount to be determined at trial which is not less than $457,400, plus interest, and

punitive damages in an amount to be determined at trial which is not less than $1,000,000;

iii. an award of compensatory damages in favor of the Estate of Catherine Butler in an

amount to be determined at trial which is not less than $940,000, plus interest, and punitive

damages in an amount to be determined at trial which is not less than $1,000,000; and iv.

an award of compensatory damages in favor of Mary Heinrich in an amount to be

determined at trial which is not less than $75,876, plus interest, and punitive damages in an

amount to be determined at trial which is not less than $1,000,000;

L.      On the Twelfth Count of Aiding and Abetting Breach of Fiduciary Duty on

behalf of the Estate against Defendant Citibank, N.A.: i. an award of compensatory

damages in favor of the Estate of Catherine Butler in an amount to be determined at trial

which is not less than $940,000, plus interest, and punitive damages in an amount to be

determined at trial which is not less than $1,000,000;

M.      On the Thirteenth Count of Unjust Enrichment on behalf of all Plaintiffs

against Defendants Malayene Dean and Charles Yassim, jointly and severally: i. an award

of compensatory damages in favor of the Leonard Trust in an amount to be determined at

trial which is not less than $135,600, plus interest, and punitive damages in an amount to be

determined at trial which is not less than $1,000,000; ii. an award of compensatory

damages in favor of the Catherine Trust in an amount to be determined at trial which is not

less than $457,400, plus interest, and punitive damages in an amount to be determined at trial which is not less than $1,000,000; iii. an award of compensatory damages in favor of the Estate of Catherine Butler in an amount to be determined at trial which is not less than $940,000, plus interest, and punitive damages in an amount to be determined at trial which is not less than $1,000,000; and iv. an award of compensatory damages in favor of Mary Heinrich in an amount to be determined at trial which is not less than $75,876, plus interest, and punitive damages in an amount to be determined at trial which is not less than $1,000,000;

N.     On the Fourteenth Count of Constructive Trust on behalf of all Plaintiffs against Defendants Malayene Dean and Charles Yassim, jointly and severally: i. an award of compensatory damages in favor of the Leonard Trust in an amount to be determined at trial which is not less than $135,600, plus interest, and punitive damages in an amount to be determined at trial which is not less than $1,000,000; ii. an award of compensatory damages in favor of the Catherine Trust in an amount to be determined at trial which is not less than $457,400, plus interest, and punitive damages in an amount to be determined at trial which is not less than $1,000,000; iii. an award of compensatory damages in favor of the Estate of Catherine Butler in an amount to be determined at trial which is not less than $940,000, plus interest, and punitive damages in an amount to be determined at trial which is not less than $1,000,000; and iv. an award of compensatory damages in favor of Mary Heinrich in an amount to be determined at trial which is not less than $75,876, plus interest, and punitive damages in an amount to be determined at trial which is not less than $1,000,000;

O.     Enjoining, prohibiting and restraining the Enterprise Defendants from transferring, assigning, selling, pledging, encumbering, conveying, secreting or otherwise

disposing of all property in which the Enterprise Defendants have an ownership interest including, without limitation, the Enterprise Defendants' property or the proceeds thereof or permitting the same to become subject to a security interest or lien other than in favor of Plaintiffs for a total amount of assets not less than the total minimum of unduplicated damages alleged herein being compensatory damages in an amount no less than $940,000, to be proved at trial, plus trebling under RICO and punitive damages in an amount to be determined by the Court no less than $1,000,000;

P.     Granting Plaintiffs an order of attachment with respect to any and all property in which the Enterprise Defendants have an ownership interest for a total amount of assets not less than the total minimum of unduplicated damages alleged herein being compensatory damages in an amount no less than $940,000, to be proved at trial, plus trebling under RICO and punitive damages in an amount to be determined by the Court no less than $1,000,000;

Q.     That Plaintiffs be awarded their costs, expenses, and attorneys' fees for bringing and prosecuting this action; and

R.     That Plaintiffs be awarded such other and further relief as this Court may deem just and proper.

## **JURY DEMAND**

Plaintiffs demand a jury trial on all issues triable by jury.

Dated: December 13, 2021

Respectfully submitted,

OFFIT KURMAN, P.A.

By:    _Ted Semaya_

Ted G. Semaya, Esq.
Eric J. Lanter, Esq.
Attorneys for Plaintiffs
590 Madison Avenue, 6th Floor
New York, NY 10022
(212) 545-1900
tsemaya@offitkurman.com

*Attorneys for Plaintiffs*

4892-7052-2630, v. 1